UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| GxG MANAGEMENT LLC, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 05-162-B-K |
| ) | |
| YOUNG BROTHERS AND CO., ) | |
| INC., ) | |
| ) | |
| Defendant ) | |

**FINDINGS OF FACT
AND
CONCLUSIONS OF LAW**[1]

On January 30-31 and February 1, 2007, I conducted a bench trial on the plaintiff's claim of breach of contract, breach of express and implied warranties, and violation of Maine's unfair trade practices law.[2] These are my findings of fact and conclusions of law.

### I. Findings of Fact

1. GxG Management, LLC, is a limited liability company organized in Delaware with a principal place of business in New York, New York.

2. GxG exists to manage the household affairs and the financial investments of the Goelet family, including their family residence on Gardiner Island in Long Island Sound and the vessel, M/V Captain Kidd IV, used to transport the family and household supplies between East Hampton, New York and Gardiner Island, New York.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

[2] I previously entered partial summary judgment in favor of the defendant on a claim of negligent and/or fraudulent misrepresentation and a portion of the deceptive trade practices claim.

3. Donald McKay is employed as a general handyman and caretaker for the Gardiner Island property and part of his duties include piloting the vessel between the mainland and the island. He has been so employed for over twenty years, and for approximately eighteen of those years he used the predecessor vessel, Captain Kidd III, as the means of transportation between the island and the mainland.

4. During the 2002-2003 time frame GxG contracted with Young Brothers and Co., Inc. of Corea, Maine to build a new boat to replace the Captain Kidd III. Kidd III was forty feet long with a 350 horsepower engine; the new boat was to be forty-five feet long with an 800 horsepower engine and cost approximately $265,000.00. The new boat was to have a fiberglass cored hull, meaning that a core of poly-foam cell would be adhered between two layers of fiberglass, providing greater stability and insulation. Both Captain Kidd boats were described as lobster boats, with certain modifications because of the intended purpose not relevant to the allegations in this complaint.

5. Young Brothers had built the Captain Kidd III and McKay had been very pleased with the boat throughout its life so when the decision was made to buy a new and larger boat, GxG went back to Young Brothers to purchase the new vessel.

6. It took longer than anticipated to build the new boat and she was not delivered until September 23, 2003. When McKay visited the boatyard during construction, he spoke most frequently with Randy Young, who was in charge of the project, and he learned that Young was experiencing difficulties with the hired help, contributing to the delay in construction.

7. On one occasion when McKay visited the boatyard, well into the construction process, he observed the engine mounts and questioned an employee about the sufficiency of those mounts. The worker told him the mounts were standard, used by the Young Brothers in all their boats.

8. The certificate of documentation was issued for the Captain Kidd IV on May 30, 2003, and the owner and managing owner was listed as GxG Management, LLC.

9. At some point in time GxG formed two separate interests under Delaware law, Series A and Series B, and gave Series B the purpose of holding the assets/liabilities associated with the Captain Kidd IV, including the boat itself, as evidenced by a new certificate of documentation issued on March 25, 2004. GxG remained listed as the managing owner on the certificate of documentation.

10. Will Morey, Jr. of Billings Marine in Stonington was aboard the Captain Kidd IV during the initial sea trial and observed nothing unusual regarding engine vibration. Donald McKay came up to Maine for a second sea trial and he felt that when the boat went over 2300 rpm there seemed to be excessive vibration, but apparently he did not find the problem particularly bothersome because no further adjustments were made to the boat.

11. Wally Gray, an experienced Maine lobsterman, delivered the boat to Long Island in September 2003. He experienced no engine problems in transit and did not notice any excessive vibration.

12. During November 2003, after the boat had been in service for a few months, McKay was experiencing problems with the engine in that it would surge high and low in certain rpm ranges. These problems were recognized as covered under the Caterpillar warranty and service people from the Long Island Caterpillar dealership came and worked on the boat. There is no indication that this problem was related in anyway to subsequent problems with engine alignment.

13. In January and February 2004 McKay did not use the boat that much because of, among other things, ice in the harbor. His diary indicates a specific notation on January 10, 2004, that he used some implement to break ice off the side of the boat that had accumulated there while

the boat was tied up at the dock.  McKay indicated he often used a pole or other device to break ice by banging the pole against the side of the boat while it was tied to the dock.

14. On February 10, 2004, while the boat was in gear with the engine idling at the dock, a piece of ice passed through the propeller.  The incident was serious enough to cause McKay, at the wheel of the boat, to feel the impact and his deckhand observed a piece of ice floating away from under the boat.

15. The next day, February 11, 2004, when McKay took the boat out he observed it had a "rumble" and a rough feel.  He took the boat to an East Hampton boatyard for repairs.

16. The boatyard workers attempted to repair the propeller *"in situ."*  That is to say that they did not remove the propeller, but instead they took a wooden mallet and bent the propeller blade to remove "dings."  After that repair the boat apparently operated normally and McKay did not notice any excessive vibration or "rumble" at the speeds of his normal operation, but on March 8, 2004, the stuffing box overheated, suggesting engine alignment problems.

17. McKay ordered a spare propeller and learned it would take six weeks to two months to obtain a new one.  He continued to operate the boat without further propeller related vibration with the repaired propeller in place.

18. During the period from March 16 to 23, the Caterpillar repairmen made three trips to service the engine for problems unrelated to the propeller incident.  No witness from either side suggests these engine problems were ultimately related to the bent shaft and engine misalignment ultimately discovered.  These engine problems included a problem with a "high low switch" and a loose wire.

19. By April 12, 2004, McKay again observed problems with the "stuffing box" in that brass shavings appeared under the box, strongly suggestive of the fact that the engine was out of alignment.

20. On April 16, 2004, the boat was hauled out of the water in order to swap the propellers and put the new propeller on the boat. At the time the boat was hauled out of the water McKay reported that there had not been any excessive vibration at the speeds of his operation between the "ice incident" and the propeller swap.

21. When the boat was hauled out of the water McKay observed that the transducer was loose and had been turned around. It was removed and it was observed that the area around the transducer had not been properly "de-cored" at the time of installation. Water had entered the core of the boat. McKay and the boatyard workers attempted to dry out the surrounding area and then re-installed the transducer without "de-coring" or making any permanent repair to the situation.

22. On April 26 the boat was again hauled out of the water in order to enable Derek Galen, a marine surveyor, to do a moisture reading check throughout the hull. Additionally, at the same time McKay felt there was increasing vibration with the motor and the boatyard was attempting to determine the cause of that problem. At this point in time the marine surveyor recommended that due to the continuing vibration the shaft should be checked. McKay did tell the surveyor about the "ice incident" in February and suggested that vibration had increased since that incident.

23. As a result of the April 26 work on the boat an alternator bracket that had vibrated loose was tightened and the bolts on the engine motor mounts were tightened and the engine was realigned.

24. On May 10 the boat was again hauled out of the water, this time in anticipation of Randy Young's arrival the following day. Young had been called about the loose transducer and the water in the hull and went to New York to address those problems.

25. In addition to a perceived problem with water leaking around the through hulls on the bottom of the vessel, McKay also had complaints about water entering the hull around the spray rails and most probably through the "scuppers" located on the transom at the rear of the boat.

26. Randy Young agreed that the transducer through hull should have been "de-cored" prior to the boat leaving Maine and he did that repair and also worked on the other through hulls below the water line.

27. Young resealed the bolt holes on the spray rail, but did not completely remove the spray rail and "de-core" the area around the bolts.

28. While the boat was out of the water on this occasion McKay again exchanged propellers, this time removing the "new" propeller and replacing it with the now reconditioned original propeller. He had been unsatisfied with the boat's performance while using the new propeller.

29. During the time Young spent in New York addressing the concerns about water in the hull core, no one complained to him about the engine problems or suggested that Young Brothers was in anyway responsible for the difficulties with engine "vibration" and misalignment.

30. In August of 2004 Victor Troiano, the vice-president for property management of GxG, informed Young Brothers that GxG continued to have concerns about water in the hull core and wanted Young Brothers to take remedial action.

31. In October 2004 Troiano informed Young Brothers that since they had taken no remedial action regarding the water in the core area of the boat, GxG intended to have the work done on its own and that it was estimated to cost in excess of $20,000.00.

32. Young Brothers, relying in part on the information from the manufacturer, did not believe that the water in the hull core presented a problem because the core would not deteriorate and there was insufficient water in the core to cause delamination. Young Brothers acknowledged that if delamination did occur they would be responsible for that defect and repair it.

33. The problem created by water in the core is not deterioration of the core material per se, but rather that the water will freeze and contract, weakening the hull and potentially causing delamination between hull layers or, under extreme circumstances and the passage of considerable time, hull breaches.

34. It was reasonable of GxG to want the hull core repaired, including not only the removal of water, but also proper "de-coring" of the through hulls throughout the vessel, including any defective bolt holes on the spray rail, to insure that more water did not penetrate into the core.

35. The problem involving the water in the hull was created by Young Brothers' failure to properly "de-core" and seal the hull cores and this failure breached the warranty of workmanlike performance. Since Young Brothers declined to perform any more warranty work to bring the through cores up to a workmanlike standard, it was reasonable and necessary for GxG to have the through hull cores repaired and water removed by a third party.

36. Peter Tinkham of Pilot's Point Marina, Inc. did extensive repair work to the Captain Kidd IV during the period between November 2004 and January 2005. He discovered that some of the bolt holes on the spray rail had not been properly "de-cored" and that in general the through hulls had insufficient sealant and "de-coring" to prevent water from continuing to seep into the hull core.

37. The reasonable and necessary cost to repair the through hull fittings and remove as much water as was possible was $ 23, 457.84 as evidenced by job code 4500 on the Pilot's Point

Marina, Inc. invoice. There is also a reasonable and necessary cost of $ 1,600.38 (job code 6720) associated with "de-coring" the scuppers on the rear transom.

38. Pilot's Point Marina, Inc. also charged an additional $ 11,189.32 to modify the spray rails as evidenced by job code 4520. These repairs were not proven as necessary to repair the three to five bolt holes on the spray rail that were not completely sealed and had apparently caused water to enter the hull. In other words, some of the through hull fittings on the spray rail had been inadequately "de-cored" and some moisture had entered, but it was not established that it was necessary to redesign the entire spray rail system or that the system Randy Young designed was not fit for the ordinary purpose of a spray rail if the bolt holes were properly de-cored and sealed. Indeed, the evidence is that only a few of the bolts were loosened and needed repair.

39. Prior to undertaking this hull core repair work and in response to McKay's continuing complaints about engine vibration at lower and lower rpm speeds, Tinkham attended a sea trial onboard the Captain Kidd IV. During that sea trial he observed loose bolts on the engine mounts and that under hard acceleration the engine was lifting up from the engine bed in an inappropriate fashion.

40. Tinkham also discovered during this repair work that the shaft connecting the propeller to the transmission and the engine, running lengthwise inside the hull of the boat, had been bent and that the engine was seriously misaligned.

41. Tinkham observed that when he disconnected the shaft from the transmission the lack of alignment was serious and plainly visible.

42. Tinkham also observed that the bolt holes for the bolts holding the plate and bracket to the stringer in the bottom of the hull, upon which the engine mounts rested, were elongated vertically and the bolts attaching the mounting system to the boat had been dislodged from a

straight horizontal position. He also observed cracks in the fiberglass encasing one of the stringers that supports two of the four engine mount brackets. The loosening and repositioning of the bolts had caused the engine "to settle" and engine movement had apparently cracked the fiberglass.

43. John B. Pride, Jr., the plaintiff's expert witness and a Caterpillar engine technician, opined that the reason the bolts loosened and the engine settled in the fashion observed by Tinkham was that the Young Brothers' engine mounting system was inadequate to support an 800 horsepower Caterpillar engine. In Pride's opinion the serious engine misalignment was caused by the engine settling over time as the bolts loosened. Pride discounted the propeller damage as the cause of engine misalignment because of the lack of visible damage and heavy vibration in the rear of the boat in the vicinity of the propeller. I accept his theory of the cause of the problem.

44. Robert Cartwright, a marine surveyor and defendant's expert witness, opined that the engine misalignment occurred initially as a result of the bent propeller in February 2004 and the continued operation of the vehicle until it was repaired in November – January 2005 time frame resulted in further bending of the shaft, increased engine vibration, and failure of the bolts on the engine mounting system. In Cartwright's opinion the engine mounting system was sufficient to support the engine had it been properly maintained and had the initial damage from the bent propeller been corrected in the appropriate fashion.

45. Neither Pride nor Cartwright believed that the size of aluminum engine mount brackets in and of itself deviated from the normal and customary practice of engine mounting systems. Pride's primary criticism was that the Young Brothers' system did not adequately support those aluminum engine mount brackets in the way the brackets were attached to the stringer of the boat.

46. Randy Young agreed that the design of an engine mounting system is part of the boat construction, and in mounting an engine he considers not only the size of the aluminum brackets holding the engine mounts, but also the size of the boat stringer to which it is attached, the type of wood used for the stringer and the amount of fiberglass applied to the stringer, all dependent upon the weight of the engine and the size of the boat.

47. This engine mounting system did not fail because of the size of the aluminum brackets that held the engine mount; it failed because the brackets were not adequately mounted to the boat.

48. The evidence does not support Cartwright's contention that the system failure was caused solely by damage done to the propeller during the February 2004 ice incident; if the "bent" propeller contributed to some engine vibration throughout the drive shaft, it was not sufficient vibration to cause an adequate engine mounting system to fail.  The failure of the bolts, as explained by Mr. Pride, occurred gradually over time and the engine settled more and more, causing more and more misalignment and ever greater vibration as time passed.

49. The Pilot's Point Marina, Inc. invoice, Plaintiff's Exhibit # 11, contains job codes 1730 and 5700, which represent the work done on the engine (mechanical) and the engine mounting system to fix the problems described by Tinkham.  Job Code 1730 reveals an expenditure of $15,846.98 and Job Code 5700 reveals an expenditure of $ 14,558.07.  With the exceptions noted in finding 50 below, these amounts represent the fair and reasonable cost of repairs to the engine mounting system as a result of the failure of the bolts.

50. The following items should be subtracted from the figures found above because they do not relate to repairs associated with the bolt failure:  (1) the installation of a drive saver ($ 987.56, plus $50.01); and (2) the price of a rope cutter ($610.00).

51. In addition to the charges noted in the above-referenced findings, Exhibit 11 contains other charges for a grand total of $ 79,667.57.  However, for those charges about which I heard no testimony, under other job codes than the ones mentioned, I am unable to find that the charges were reasonable and necessary because of any failure associated solely with through hull de-coring or the bolt failure associated with the engine brackets.

52. I find, based upon the testimony of Peter Tinkham, that a portion of the environmental charge and the total sales tax charge attributable to the proportionate share of the total invoice was caused by the bolt failure and the through hull de-coring/moisture repairs.

53. The total damages attributable to these two problems were $55, 463.27 (minus $1,647.57) = $53,815.70, plus the proportionate share of $ 779.89 in environmental charges and $ 898.94 in sales tax.  (I conclude that fifty-four thousand is roughly 2/3 of eighty thousand and the proportionate share is $ 515.00 and $593.00).  The total amount of damages is $ 54,923.70.

54. Victor Troiano, an employee of GxG, paid Pilot's Point Marine for the repair work with a check drawn on a Series B bank account.  GxG Management signed the payment check on behalf of Series B.

55. Young Brothers were never notified of nor asked to repair the bolt deficiency until after it was discovered by Tinkham during the repair work of January 2005.  During Randy Young's trip to Connecticut in May 2004 the only complaints made to him had pertained to moisture in the through core hull, although he knew from conversations with McKay that there were ongoing problems with the Caterpillar engine alignment.

## II. Conclusions of Law

### A. GxG's Ability to Act as the Named Plaintiff

The plaintiff, GxG Management LLC, filed a motion to join a real party in interest, namely GxG Management LLC (Series B), a "series" of limited liability company "interest" certified by GxG Management LLC pursuant to a Delaware statute that authorizes Delaware LLCs to establish one or more "series" of "limited liability company interests having separate rights, powers or duties with respect to specified property or obligations of the limited liability company." 6 Del. Code Ann. § 18-215(a). When such series are separately managed, "then the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular series shall be enforceable against the assets of such series only, and not against the assets of the limited liability company generally." Id. § 18-215(b).

The Delaware statute does not indicate what capacity an LLC has to pursue litigation on behalf of its series, See Fed. R. Civ. P. 17(b). Nor does the statute indicate what capacity a series of an LLC has, if any, to pursue litigation on its own behalf, [3] or even whether it should be regarded as an entity distinct from the LLC from which it is carved. Although GxG Management LLC contracted for the construction of the vessel and purchased the vessel, it subsequently identified GxG Management LLC (Series B) as the "owner" and GxG Management LLC as the "managing owner" on the Certificate of Documentation for the vessel. The motion to join the Series B raised concerns related to judicial administration because it came more than 10 months after the deadline set in the Court's scheduling order for amendment of pleadings and joinder of parties. Counsel for GxG declined the option of merely substituting one party for the

---

[3] One commentator has suggested that an LLC series in Delaware has no capacity to sue or be sued. Taxing Series LLCs, 45 Tax Mgmt. Mem. (BNA) No. 4, at 76 (Feb. 23, 2004).

12

other and I denied the motion to amend on the eve of trial, allowing the case to proceed with only the originally named plaintiff.

GxG Management LLC, in its reply brief filed in response to Young Brothers' objection to the motion to join, made the following statement:

> Also, GxG Management, LLC is not a separate entity from "Series B." 6 Del. C. Section 18-215 (2006) does not create a separate entity that stands alone for all purposes under Delaware law.

(Pl.'s Reply at 4).  Aside from the question of whether Series B has any capacity to sue as a distinct entity, it is equally unclear to me whether GxG Management LLC assigned all of its rights under the Young Brothers contract to Series B.  GxG Management LLC hints that it did (Pl.'s Reply at 7), but cites only the third "Whereas" paragraph of the "GxG Management LLC Separate Series B Agreement":

> WHEREAS, the sole member of the Company consents that the motor vessel described in Attachment 1 shall be the property of the new Series B of GxG Management, LLC.

(Docket No. 50, Elec. Attach. No. 3.)    The evidence adduced at trial did not shed any light on this issue.

GxG Management LLC and Series B both have an interest in the Captain Kidd IV.  GxG manages all aspects of the vessel, including use, maintenance, payment of obligations, and decisions regarding contracts.  Series B is simply the listed legal owner and the entity whose assets would be responsible for satisfying any obligations that were incurred by the Captain Kidd IV.  This case is not about obligations incurred by the Captain Kidd IV, it is about rights under a contract formed between Young Brothers and GxG before Series B even existed.  GxG maintains a real interest in the vessel as the managing owner and the entity who makes sure the boat is properly maintained and can

be used by the Goelet family for its intended purposes. I am satisfied that GxG has a sufficient interest in this boat to maintain this action and that it has a unity of interest with Series B such that under Maine law Series B could not obtain judgment against the Young Brothers for these same events. Northeast Harbor Golf Club, Inc. v. Town of Mount Desert, 618 A.2d 225 (Me. 1992). In these circumstances I am satisfied that GxG can maintain this action as the real party in interest, even if it has transferred nominal ownership to Series B.

**B. The Maine Unfair Trade Practices Act**

GxG's claim under the Maine Unfair Trade Practices Act[4] consisted of two components. First, GxG claimed negligent or intentional (fraudulent) misrepresentations regarding the engine mounting brackets. I entered partial summary judgment on that claim because I found that GxG did not present any evidence in the summary judgment record establishing detrimental reliance upon a material false statement of fact or a material misrepresentation that misled the consumer regarding choice or conduct in relation to a product. Nothing presented in the evidence at trial altered that basic conclusion. However, I also find from the trial evidence that the size of the engine mount brackets, the alleged misrepresentation made by a Young Brothers' employee named Hammond who was not a witness in this trial, was not material to the bolt hole failure in any event. Plaintiff's own expert testified that the engine mounting system failed because of inadequate attachment of the brackets to stringers that were not adequately reinforced. Larger engine brackets might have been one way to avoid this problem, but Mr. Pride testified that nothing in the size of these brackets was different from a typical installation. He merely noted the brackets should have had an arm resting over the stringer to increase their strength to support the weight of such a large engine, not that they needed to be larger brackets. Thus the Young

---

[4] 5 M.R.S.A. §§ 205A-214.

14

Brothers' employee who told McKay that "that's the way they build all their boats" was not making any sort of misrepresentation regarding the size of engine mounting brackets. My summary judgment order disposed of the allegation of deceptive trade practices as they may pertain to this case, in any event. But the alleged misrepresentation about the size of the aluminum brackets used to hold the engine mounts did not constitute a material misrepresentation in any event, even if one were somehow able to conclude that GxG relied upon it.

The second component of GxG's UTPA claim is an unfair trade practice claim of the sort described in State v. Weinschenk, 2005 ME 28, ¶ 16, 868 A.2d 200, 206. It is a claim of unfairness, whether based upon intentional deceit or not. In order to justify a finding of unfairness the act or practice: "(1) must cause, or be likely to cause, substantial injury to consumers (2) that is not reasonably avoidable by consumers and (3) that is not outweighed by any countervailing benefits to consumers or competition." Id. (internal punctuation omitted). GxG points to the Young Brothers' failure to properly de-core the hull and their failure to perform the necessary warranty work to remove the resulting moisture from the hull. Young Brothers' lack of intent to deceive, or good faith, while relevant to this case by case inquiry, is not dispositive of whether or not an act or practice is unfair under the UTPA. Id., ¶ 17. However, a "garden variety" breach of warranty does not necessarily constitute an unfair trade practice. Searles v. Fleetwood Homes of Pennsylvania, Inc., 2005 ME 94, ¶ 34, 878 A.2d 509, 520.

GxG argues that the failure to properly de-core the through hulls satisfies the unfairness standard because the problem, theoretically, could have caused a break up of the ship's hull, thereby creating a likelihood of causing substantial injury to consumers. However, even

according to Mr. Wyman, the plaintiff's expert, before that happened the moisture would have had to cause delamination to occur. Young Brothers acknowledged that if any delamination occurred they would be responsible for repairs, but in their opinion the amount of moisture presently in the hull did not justify further action at that time. While GxG may have rightfully believed that Young Brothers had an implied warranty obligation to de-core the through hull openings and remove the existing excess moisture, I am simply not persuaded by their argument that this problem was life threatening now or likely to be so in the near future. I view this as a "garden variety" breach of warranty on Young Brothers' part and therefore enter judgment on their behalf on the UTPA claim.

### C. The Contract and Warranty Claims

The contract documents in this case are sparse. Plaintiff's Exhibit 1 (A-C) contains a vessel description, but is certainly not a signed contract containing contract specifications or express warranties. At the conclusion of construction, Young Brothers presented an e-mail invoice for $264,522.15 (Plaintiff's Exhibit 5) which was apparently paid pursuant to the contract, but other than those bare facts, the record contains no evidence of the contract terms. There was some chatter about the boat taking longer to construct than anticipated, but the delay is not alleged as a breach of contract. Accordingly, I find no breach of any express warranty, written or oral, contained within the contract.

Turning to alleged breaches of implied warranty, GxG asserts in its complaint that Young Brothers breached its contractually implied warranties of merchantability and fitness for the ordinary purpose as to both the through hull and the engine mount design. Young Brothers counters that the ordinary "purpose of coring a boat is for it to become drier, stiffer, and quieter" (Plaintiff's Exhibit 9 C) and that the Captain Kidd IV's core "is doing exactly as it was intended

16

to do."  On the other hand Mr. Wyman, plaintiff's expert, testified that a through hull that allowed moisture to enter the core of the boat would eventually, with the process of freezing and thawing, cause the core to delaminate from the fiberglass, rendering the hull unsafe and certainly allow ever more moisture into the boat.  Randy Young conceded that if the process of delamination did occur it would render the hull no longer fit for its intended purpose.  The dispute concerned the likeliness of that  delamination ever occurring based upon the acknowledged defects with the through hull core openings.   On this issue I am satisfied that GxG has proven it more likely than not that the acknowledged defects in the de-coring process around the through hull openings rendered the core unfit for its ordinary purpose and Young Brothers had an obligation to fix those defects and remove the excess water from the hull.

    Related to this claim is approximately another $11,000.00 worth of repairs to the spray rails.  Pilot's Point Marine redesigned the system for mounting the spray rails on the boat, running the bolts all the way through the fiberglass and attaching them through a nut inside the hull.  While I can understand why this system might be easier to maintain than the attachment designed by Randy Young, which essentially implanted the bolts in the core so the nut was inaccessible if the bolt needed to be tightened, no one explained why the spray rail system designed by Young Brothers was not fit for its ordinary purpose, with the exception of the few bolt holes identified as improperly sealed allowing some very small amount of water to enter the core.  Thus, I am not persuaded that defendant should be responsible for this portion of the repair work.

    Turning to the engine bracket mounts, the evidence, primarily the expert testimony of John Pride, has persuaded me that more likely than not the engine mount design was not fit for its ordinary purpose of providing secure attachment of the engine to the boat.  The evidence

17

requires one to decide whether the propeller damage in the first instance caused such serious vibration that it bent the shaft and threw the engine out of alignment causing increased vibration and damage to the engine mounting system including the failure of the bolts, or whether the engine mounting design was simply unfit to hold the 800 horsepower engine within the normal vibrations and movement associated with operating the boat and therefore the bolts gradually loosened, the fiberglass cracked and the engine was thrown more and more out of alignment. I conclude the latter series of events to have been more likely than the former.

There is indeed some circumstantial evidence that points to the former theory being the more likely one. Although there had been sporadic recorded complaints about excess vibration at high rpm's prior to the February 11 "ice incident," indisputably the serious problems began following the ice incident. However, weighing against that circumstantial evidence is McKay's testimony that the propeller repair removed any serious "rumble" from the engine and the problem was no worse than it had been prior to the "ice incident" after the first repair of the propeller. It is certainly not usual for a boat propeller to become slightly damaged during normal operation – presumably that is why most boat operators commonly keep a "spare" propeller available for use during routine maintenance. Additionally Mr. Pride was convinced that if the "ice incident" had been serious enough to cause damage to the propeller great enough to increase the vibration and bend the shaft to such an extent that the bolts were pulled loose from the engine mounting stringers, it would have made operation of the boat extremely difficult and the vibration would have been "bone rattling" at all rpm's. Pride also recognized when he first was shown photographs of the engine mounting system that the aluminum brackets, while of a size customary in the trade, were not mounted to the boat's stringers in a proper fashion for an engine of this size. He saw this problem before he knew any of the history or details of the boat's

18

repairs.  I am satisfied that the engine misalignment resulted from a breach of the implied warranty that the engine mounting system would be fit for its ordinary purpose of holding the engine in place to maintain engine alignment.

Based upon the foregoing findings of fact and conclusions of law, judgment will enter for plaintiff GxG Management LLC on Counts I, III and IV of the complaint in the amount of $54,923.70, plus interest, including prejudgment interest in accordance with state law, and costs. Judgment is entered for the defendant on all other counts.

*So Ordered.*

Dated this 21st day of February 2007.

/s/ Margaret J. Kravchuk  
U.S. Magistrate Judge